**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHEN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| Richard Perry, | : | Case No. 3:09CV01847 |
| Plaintiff, | : | |
| v. | : | |
| Commissioner of Social Security, | : | **MAGISTRATE'S REPORT AND RECOMMENDATION** |
| Defendant. | : | |

Plaintiff seeks judicial review, pursuant to 42 U.S.C. § 405(g), of Defendant's final determination denying his claim for disability insurance benefits (DIB) under Title II of the Social Security Act (Act), 42 U. S. C. §§ 416 (i) and 423 and for Supplemental Security Income (SSI) under Title XVI of the Act, 42 U. S. C. §§ 1381 *et seq*.  Pending are the parties' briefs on the merits and Plaintiff's Reply (Docket Nos. 12, 13 and 14).  Based upon the evidence that follows, it is recommended that the decision of the Commissioner be affirmed and that the referral to the Magistrate be terminated.

**PROCEDURAL BACKGROUND**

On July 20, 2005, Plaintiff filed applications for SSI and DIB (Tr. 329-333, 334-336).  The applications were denied initially and upon reconsideration on November 14, 2005 and February 2, 2006, respectively (Tr. 325-327, 322-324, 29-31, 26-27).  ALJ Bryan J. Bernstein conducted a hearing

on December 21, 2007.  Plaintiff, represented by counsel, and Vocational Expert (VE) Dr. Joseph

Havranek appeared and testified (Tr. 341).  On September 10, 2008, ALJ Bernstein rendered an

unfavorable decision (Tr. 12-21).  The Appeals Council denied Plaintiff's request for review on June

18, 2009 (Tr. 3-5).  Plaintiff filed a timely civil action in this Court on August 18, 2009 (Docket No. 1).

## JURISDICTION

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42

U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  *McClanahan v. Commissioner of Social Security,* 474 F.3d

830, 832 -833 (6th Cir. 2006).

## FACTUAL BACKGROUND

*Plaintiff's Testimony.*

Plaintiff completed the twelfth grade, was married and his emancipated son returned home to

care for him.  Plaintiff did not often drive; however, his spouse drove and performed the household

chores.  Plaintiff's assistance was limited to grocery shopping (Tr. 358, 359-362, 367).

While employed as a forklift operator at Meijer®, Plaintiff collided with a pole (Tr. 345, 364).

Plaintiff suffered head trauma and neck problems as a result of the collision (Tr. 345).  In June 2005,

he underwent neck surgery (Tr. 346, 348. 350).  Plaintiff conceded that the neck surgery helped to

improve his neck problems (Tr. 348).  However, while undergoing treatment for his neck, Plaintiff

injured his back (Tr. 347).  The back pain permeated his body and affected his ability to engage in day-

to-day functions (Tr. 350).  As treatment, Plaintiff had undergone physical therapy.  He was undergoing

pain management therapy and contemplating surgery when the pain became intolerable (Tr. 352).  The

pain in his back was exacerbated by prolonged sitting (Tr.  360-361).

Plaintiff developed numbness on his right side that affected the back of his legs. Consequently, Plaintiff walked with a cane (Tr. 349).

Plaintiff had advanced emphysema. As a result, he had difficulty breathing and he was easily fatigued. When walking, Plaintiff became breathless (Tr. 361).

To treat his symptoms, Plaintiff was prescribed an analgesic pain reliever, a muscle relaxer, an anti-inflammant, cholesterol reducing medication, a bronchodilator, a steroid and a nebulizer (Tr. 353, 354, 355, 356). A decision was pending as to whether he would be prescribed an oxygen tank (Tr. 357).

Plaintiff estimated that he could stand for five minutes. He did not estimate how long he could walk but noted that he could not walk without a cane (Tr. 359-360). He could lift a gallon of milk (the industry standard for a gallon of milk is 8.6 pounds (Http://wiki.answers.com). He had difficulty manipulating his hands. When sitting, Plaintiff had difficulty reaching and pulling things. Reaching affected the pain in his shoulders and back (Tr. 360).

Plaintiff had been employed as a manager for Denny's® (Tr. 363). He considered himself a working manager responsible for ordering food, staffing, scheduling, unloading trucks, taking inventory and hiring and firing (Tr. 365, 371, 372). Ultimately, the restaurant closed (Tr. 363). Plaintiff concluded that he was unable to return to this type of work as it entailed bending and lifting (Tr. 364).

Plaintiff surmised that he was unable to work as a manager as he performed the job (Tr. 365). The arduous work would probably affect his breathing (Tr. 366).

*VE's Testimony.*

Dr. Havranek determined that a claimant with Plaintiff's profile could perform work as a restaurant manager as indicated in the Dictionary of Occupational Titles (DOT) (Tr. 367). The VE acknowledged that the conflict in the occupational evidence and the characterization of manager were

inconsistent because the duties had changed.  In large part, managers of franchises such as Denny's®, are responsible for the day-to-day operations at their discretion.  The decision-making challenges were made by corporate personnel.  Thus, duties such as ordering, staffing, scheduling could be performed by staff members (Tr. 368-369).

Plaintiff's skills would transfer to perform work as a food service supervisor for a nursing home, school or hospital as defined in DOT 319.137-010 (1991 WL 672759).  There would be approximately 1,500 to 2,000 jobs in the region.  In addition, in the sedentary level, he could perform work as a diet clerk as defined at DOT 245.587-010 (1991 WL 672276).  There would be approximately 500 to 700 regional jobs.  Further, Plaintiff could perform work as a food checker as defined at DOT 211.482-014 (1991 WL 671856).  There are approximately regional 500 to 1,000 jobs (Tr. 370-371).

## **MEDICAL EVIDENCE**

In October 2003, Dr. Nestor P. Zambrano diagnosed/or and treated Plaintiff for chronic obstructive pulmonary disease (COPD), pulmonary emphysema and blood in his stool (Tr. 258).  The levels of creatinine and blood urea nitrogen were extremely low.  The total iron building capacity was extremely elevated (Tr. 262).

Plaintiff underwent a colonoscopy on December 9, 2003 (Tr. 312).

After his accident at Meijer®, Plaintiff was diagnosed with an acute concussion, an acute cervical strain and an acute facial laceration with suture closure (Tr. 314, 318).  Although there were no fractures, extensive degenerative changes of the cervical spine were noted (Tr. 319).

Plaintiff presented to the emergency room on February 25, 2005, for neck pain, on February 28, 2005, for back, shoulder, hand and rib pain, on March 3, 2005, for pain emanating from the herniated cervical disk and on March 30, 2005 for an impacted cerumen in both ears.  A pain reliever was

prescribed to address pain issues and Plaintiff's ear canals were irrigated (Tr. 304-305, 306-308, 310-311, 311A).

On April 5, 2005, Dr. Sonia Girgis explained that there was electrodiagnostic evidence to support a diagnosis of acute cervical radiculopathy at C5-C6 and C6-C7 levels (Tr. 300, 302-303).  Plaintiff underwent a cervical diskectomy at C5-6 and C6-7 on June 6, 2005 (Tr. 220-230).

The results from a pulmonary function study administered on October 11, 2005, confirmed the presence of moderate COPD (Tr. 268).

Dr. Steven B. Nutter, conducted an internal medicine examination on October 11, 2005.  It was his impression that Plaintiff had chronic cervical and lumbar strain and emphysema (Tr. 280).  He further opined that the range of motion in Plaintiff's cervical spine and dorsolumbar spine was less than normal but the range of motion in his shoulders, elbows, wrists, hands/fingers, hips, knees and ankles was normal (Tr. 282-285).

Chest X-rays conducted on October 11, 2005, showed that the cardiac and mediastinal contours were within normal limits (Tr. 286).

On November 7, 2005, Dr. Zambrano, diagnosed Plaintiff with COPD, pulmonary emphysema, chronic pain in neck and varicose veins in both legs (Tr. 238).  Even with these impairments, it was Dr. Zambrano's opinion that Plaintiff could lift/carry up to five pounds frequently and occasionally; however, Plaintiff was extremely limited in his ability to push/pull and markedly limited in his ability to bend, reach, handle and to employ repetitive foot movements (Tr. 239).

The results from the Doppler study conducted on December 22, 2005, showed no evidence of deep vein thrombosis or superficial thrombophlebitis in either leg (Tr. 217).  Reflux was noted bilaterally in the femoral veins (Tr. 218).

On March 3, 2006, a computed tomographic (CT), with and without contrast, was administered on Plaintiff's cranium.  The results showed no acute intracranial abnormality.  There was a minimal amount of ethmoid sinusitis (Tr. 199).  The magnetic resonance imaging (MRI) test that was also administered on March 3, 2006, showed minimal desiccation of the disc at L4-5 and L5-S1, mild bulging of disc material at L4-5 and focal disc herniation at L5-S1 (Tr. 236).

On March 14, 2006, Plaintiff presented to the hospital for uncontrolled back pain (Tr. 231).  He was discharged in stable condition with a prescription for a pain reliever (Tr. 233).

On September 26, 2006, Dr. Zambrano reaffirmed his diagnoses of moderate chronic obstructive lung disease, chronic low back pain, herniated disc at L5-5 and cervical disc protrusion (Tr. 188, 200, 201, 202).  He opined that Plaintiff could lift/carry up to five pounds frequently and occasionally.  However, Plaintiff was extremely limited in his ability to push/pull and markedly limited in his ability to bend, reach, handle and engage in repetitive foot movements (Tr. 190).

The comprehensive metabolic panel conducted on April 2, 2007, showed evidence of elevated protein levels (Tr. 216).

Beginning in May 2007, Dr. Hudson V. Jones treated Plaintiff for persistent headaches (Tr. 174-180).  The results of the CT scan administered on July 5, 2007, were unremarkable (Tr. 181).

There was evidence of a possible new lung nodule observed during the radiological examination administered on May 16, 2007 (Tr. 215).

In October 2007, Plaintiff underwent a comprehensive neurological study to assess the etiology of his persistent headaches (Tr. 209).  There was electrodiagnositic evidence of a right L5, S1 radiculopathy of the tested extremities.  There was no evidence of mononcuropathy or polyneuropathy of the tested extremities (Tr. 210).

Dr. Mahmoud Mohamed prescribed medication to treat the headaches on October 19, 2007.  He also prescribed medication designed to treat pain for both the headaches and back pain (Tr. 211).

In December 2007, Dr. Jones ordered that a lipid profile be conducted.  It was determined that Plaintiff's "bad cholesterol" levels were elevated (Tr. 184).

The saturation of oxygen in Plaintiff's blood was monitored on three occasions:

| DATE | LONGEST CONTINUOUS SATURATION | EVENTS OF DESATURATION |
|---|---|---|
| December 13, 2007, 20:59 to December 14, 2007, 08:46. | <89–00:04:48 | 86 desaturation events of less than three minutes in duration.  There were 24 desaturation events over three minutes in duration (Tr. 163-170). |
| December 17, 2007, 22:49 to December 18, 2007, 07:20. | <89 ---00:00:20 | 54 desaturation events of less than three minutes in duration.  There were 24 desaturation events over three minutes in duration. (Tr.156-162). |
| March 18, 2008, 16:17 to March 19, 2008, 10:09. | <=88 was 00:00:12 | 23 desaturation events of less than three minutes in duration.  There were 16 desaturation events over three minutes in duration (Tr. 145-153). |

On February 2, 2008, Dr. Mohmoud Mohamed determined that Plaintiff did not need a cane to ambulate minimally in a normal work day.  In fact, Plaintiff could:

(1)     stand/walk at one time for sixty minutes.
(2)     stand/walk during an eight-hour workday for sixty minutes.
(3)     sit at one time for sixty minutes.
(4)     stand at one time for sixty minutes.
(5)     lift and carry occasionally, twenty pounds.
(6)     lift and carry frequently, ten pounds.
(7)     stoop, climb stairs or steps, walk on uneven ground and work around hazardous machinery occasionally.
(8)     balance, finger, handle, reach, twist, operate hand controls and foot controls constantly.
(9)     operate a motor vehicle, tolerate heat, tolerate cold and tolerate dust, smoke or fumes exposure frequently.

(Tr. 171-172).

The radiological interpretation of X-rays performed on Plaintiff's left leg/knee on April 7, 2008,

showed no acute process.  There was evidence of a small vacuum phenomenon seen in the medial joint (Tr. 141).

## STANDARD OF DISABILITY

The standard for disability under both the DIB and SSI programs is substantially similar.  *See* 20 C.F.R. § 404.1520 and 20 C.F.R. § 416.920 (Thomson Reuter 2010).  To assist clarity, this Report and Recommendation references only the DIB regulations, except where otherwise necessary.

To establish entitlement to disability benefits, a claimant must prove that she or he is incapable of performing substantial gainful activity due to a medically determinable physical or mental impairment that can be expected to result in death or to last for at least twelve months.  *Murphy v. Secretary of Health and Human Services*, 801 F.2d 182, 183 (6th Cir. 1986) (*citing* 42 U. S. C. § 423(d)(1)(A)).  The claimant must show that his/her impairment results from anatomical, physiological or psychological abnormalities that are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  20 C.F.R. §§ 404.1513, 404.1528, 416.913, 416.928 (Thomson Reuters 2010).

To determine disability, the ALJ uses a five-step sequential evaluation process.  20 C.F.R. §§ 404.1520 (a) - (f) and 416.920 (a) - (f) (Thomson Reuters 2010).  The ALJ considers whether the claimant:  (1) is working and whether that work constitutes substantial gainful activity, (2) has a severe impairment, (3) has an impairment which meets or equals the durational requirements listed in Appendix 1 of Subpart P, Regulations No. 4, (4) can perform past relevant work, and (5) if he or she cannot perform his/her past relevant work, then his/her RFC, age, education and past work experience are considered to determine whether other jobs exist in significant numbers that accommodate him/her.  20 C.F.R. §§ 404.1520(a)-(f) and 416.920(a)-(f) (Thomson Reuters 2010).

A finding of disability requires an affirmative finding at step three or a negative finding at step

five.   The claimant bears the burden of proof at steps 1-4, after which the burden shifts to the

Commissioner at step five.   The ALJ's analysis at step five typically involves an evaluation of the

claimant's residual functional capacity to perform a particular category of work (i.e., sedentary, light,

medium, heavy or very heavy work), in combination with an application of the grid to determine whether

an individual of the claimant's age, education and work experience could engage in substantial gainful

activity.  *See* 20 C.F.R. Pt. 404, Subpart P, App. 2 (Thomson Reuters 2010).

## THE ALJ'S FINDINGS

After careful consideration of the disability standards and the entire record, the ALJ made the

following findings:

1.     Plaintiff met the insured status requirements of the Act through December 31, 2010.

2.     Plaintiff had not engaged in substantial gainful activity since February 20, 2005, the alleged onset date of his impairments.

3.     Plaintiff had severe impairments; however, such impairments did not, singly or in combination, meet or medically equal one of the listed impairments in 20 C. F. R. Part 4, Subpart P, Appendix 1.

4.     Plaintiff had the residual functional capacity to perform a restricted range of work activity.

5.     Plaintiff was able to perform his past relevant work.

6.     Plaintiff was a younger individual on the alleged disability onset date and he was 50 years of age, which is defined as closely approaching advanced age on July 23, 2007, the day before his 50th birthday.  Plaintiff had at least a high school education and was able to communicate in English.

7.     Transferability of job skills was not material to the determination of disability while Plaintiff was less than 50 years of age because using the Medical-Vocational Rules (the Grids) as a framework supports a finding that Plaintiff is not disabled; however, transferability was material to the determination of disability when Plaintiff was 50 years of age or older because using the Medical-Vocational Rules as a framework supports a finding that Plaintiff was not disabled if his job skills are transferrable but disabled if his

job skills are not transferrable.

8.    Considering Plaitniffs's age, education, work experience and residual functional capacity, there are jobs that exist in significant number in the national economy that Plaintiff can perform.

9.    Plaintiff had not been under a disability as defined under the Act from February 20, 2005 through September 10, 2008.

(Tr. 12-21).

## STANDARD OF REVIEW

Pursuant to 42 U. S. C. §§ 405(g), this Court has jurisdiction to review the Commissioner's decisions. *Cutlip v. Secretary of Health and Human Services*, 25 F. 3d 284, 286 (6th Cir. 1994).  Judicial review of the Commissioner's decisions is limited to determining whether such decision is supported by substantial evidence and whether the Commissioner employed the proper legal standards. *Id*. (*citing Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971)).  Substantial evidence is more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* (*citing Kirk v. Secretary of Health & Human Services*, 667 F.2d 524, 535 (6th Cir. 1981) *cert. denied,* 103 S. Ct. 2428 (1983)).  The reviewing court may not try the case *de novo*, nor resolve conflicts in the evidence, nor decide questions of credibility. *Id.* (*citing Brainard v. Secretary of Health & Human Services*, 889 F.2d 679, 681 (6th Cir.1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir.1984)).

In determining the existence of substantial evidence, the reviewing court must examine the administrative record as a whole. *Id.* (*citing Kirk*, 667 F.2d at 536).  If the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently, *See Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir.1983), and even if substantial evidence

also supports the opposite conclusion.  *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc).

## DISCUSSION

In his Brief on the Merits and Reply, Plaintiff argues that the ALJ erred by:

1.      failing to determine how long Plaintiff could sit without interruption;

2.      failing to include the frequency that Plaintiff could sit without interruption in the hypothetical question posed to the VE;

3.      relying on nonexistent VE testimony to justify a conflict between the VE's testimony and the DOT;

4.      finding that he can perform light work;

5.      failing to include any restrictions on walking in the hypothetical posed to the VE.

6.      failing to precisely identify Plaintiff's past relevant work; and

7.      relying on the wrong categories of the Grid.

**1.      DID THE ALJ ERR IN FAILING TO DETERMINE HOW LONG PLAINTIFF COULD SIT WITHOUT INTERRUPTION?**

The ALJ found that Plaintiff has a residual functional capacity to perform a restricted range of work activity limited by an option to sit or stand while working.  Plaintiff contends that SSR 96-9p requires that the ALJ specify how much time is to be spent standing and sitting when giving a sit/stand option as part of the residual functional capacity.  Defendant contends that the ALJ could actually include a greater restriction than a residual functional capacity finding if he specified a certain number of minutes that Plaintiff would have to sit.  Failure to include the frequency of alternation was not reversible error.

Plaintiff correctly cites to SSR 96-9p which states that the residual functional capacity assessment must be specific as to the frequency of the individual's need to alternate sitting and standing.  *Williams v. Astrue,* 2009 WL 2840497, *10 (E. D. Mich.2009).  This does not mean that the residual functional capacity finding must contain increments of time to be spent in each position where the residual functional

capacity states unambiguously that the claimant needs to be able to sit or stand at will.  *Id.* (*citing Ketelboeter v. Astrue,* 550 F.3d 620, 626 (7th Cir. 2008)).

Contrary to Plaintiff's contention, the failure to specify how long Plaintiff could sit without interruption was not error since the ALJ clearly intended that Plaintiff is able to alternate between sitting and standing at his discretion (Tr. 15, 17).  The frequency requirement is met by permitting Plaintiff the ability to sit and/or stand at will.  The Magistrate does not find that remand is warranted to limit the number of times that Plaintiff could spend in each position during the eight-hour workday.

**2.    DID THE ALJ ERR IN FAILING TO INCLUDE THE NEED FOR A SIT/STAND OPTION IN THE HYPOTHETICAL QUESTION POSED TO THE VE?**

Plaintiff argues that the hypothetical question posed to the VE did not include a sit/stand option of any kind.  Assuming *arguendo* that the hypothetical question posed to the VE included a sit/stand option, the question was erroneous as it did not specify how long Plaintiff could sit without interruption. In response, Defendant argues that this argument fails because the ALJ did include a sit/stand option in a hypothetical question posed to the VE.

A hypothetical question must precisely and comprehensively set out every physical and mental impairment of the applicant that the ALJ accepts as true and significant.  *Schmidt-Ress v. Astrue,* 2010 WL 1258015, *9 (N. D. Ohio 2010) (*see Varley v. Secretary of Health & Human Services*, 820 F.2d 777, 779 (6th Cir. 1987)).  Where the hypothetical question is supported by the evidence in the record, it need not reflect unsubstantiated allegations by claimant.  *Id.* (*see Blacha v. Secretary of Health & Human Services*, 927 F.2d 228, 231 (6th Cir. 1990); *Casey v. Secretary of Health & Human Services,* 987 F.2d 1230, 1235 (6th Cir. 1993) ("It is well-established that an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate those limitations accepted as credible.")).  However, where the ALJ relies upon a hypothetical question that fails to adequately account for all of the claimant's

12

limitations, it follows that a finding of disability is not based on substantial evidence.  *Id.* (*see Newkirk v. Shalala,* 25 F.3d 316, 317 (6th Cir. 1994)).

The first hypothetical question posed to the VE considered someone who would have to sit or stand while working (Tr. 367).  The frequency of the Plaintiff's need to alternate sitting and standing in this case is at Plaintiff's discretion.  The ALJ did not err by failing to specify the increments of time during which Plaintiff could sit and/or stand in a hypothetical question posed to the VE.

### 3.    DID THE ALJ PROPERLY RELY ON THE DOT?

Plaintiff argues that the VE's testimony was inconsistent with jobs found in DOT as jobs included in DOT do not incorporate the nature and extent of sit/stand options.  Plaintiff further argues that the ALJ breached his affirmative duty to resolve this conflict and provide a reasonable explanation for the departure from DOT.  Defendant argues that the DOT does not address sit/stand options; consequently, the VE's testimony cannot be in conflict with the DOT when the DOT is silent on the subject.

The DOT contains information about most, but not all, occupations.  POLICY INTERPRETATION RULING: TITLES II AND XVI: USE OF VOCATIONAL EXPERT AND VOCATIONAL SPECIALIST EVIDENCE, AND OTHER RELIABLE OCCUPATIONAL INFORMATION IN DISABILITY DECISIONS, SSR 00-4p, 2000 WL 1898704, *2 (December 4, 2000).  The DOT's occupational definitions are the result of comprehensive studies of how similar jobs are performed in different workplaces.  *Id.*  The term "occupation," as used in the DOT, refers to the collective description of those jobs.  *Id.*  Each occupation represents numerous jobs.  *Id.*  Information about requirements of a particular job or about occupations not listed in the DOT may be available in other reliable publications, information obtained directly from employers, or from a VE's or (vocational specialist) VS's experience in job placement or career counseling.  *Id.*

The DOT lists maximum requirements of occupations as generally performed, not the range of

13

requirements of a particular job as it is performed in specific settings.  A VE may be able to provide more specific information about jobs or occupations than the DOT.  *Id.*  Occupational evidence provided by a VE generally should be consistent with the occupational information supplied by the DOT.  *Id.* at *2. When there is an apparent unresolved conflict between VE evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE evidence to support a determination or decision about whether the claimant is disabled.  *Id.*  At the hearing level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.  *Id.*

There is no requirement in SSR 00-4p that a VE or an ALJ use any particular specific terminology such as "based on first-hand or professional knowledge" to explain the basis of a variation or conflict between the VE's opinion evidence about the requirements of a job or occupation and the information provided in the *DOT* about the job or occupation.  *Id.*  The standard required of an ALJ in explaining why she or he relies on the testimony of a VE when such testimony is not consistent with information found in the *DOT* is that the ALJ must resolve this conflict before relying on the VE evidence to support a determination or decision that the individual is or is not disabled.  *Id.*  The adjudicator will explain in the determination or decision how he or she resolved the conflict.  *Id.*  The adjudicator must explain the resolution of the conflict irrespective of how the conflict was identified.  *Id.*

Assuming that a conflict existed in this case, the ALJ requested that the conflict be resolved and the VE resolved this conflict by explaining that the resident functions performed in the jobs listed in DOT and many other restaurants were similarly performed.  The VE's testimony did not contravene the provisions in DOT.  The VE, relying on his knowledge and expertise, explained the distinction between the jobs Plaintiff performed and DOT, advising the ALJ that the differences were not so significant that

14

the DOT did not apply as a basis for determining the maximum requirements for occupations in the restaurant industry as generally performed (Tr. 367-368). The VE was able to provide more specific information about jobs or occupations than DOT. The ALJ's decision is consistent with the standards for use of occupational information as designated in SSR 00-4p as he addressed the conflict and its resolution in the written decision (Tr. 21).

4.  **DID THE ALJ ERR IN FINDING THAT PLAINTIFF COULD PERFORM LIGHT WORK?**

Plaintiff contends that light work, by definition, requires the ability to stand and/or walk for a total of six hours per workday. Thus, Plaintiff argues that the VE's identification of light jobs (food service manager, DOT 187.167-106, and food service supervisor, DOT 319-137-010) in response to the hypothetical question will not accommodate Plaintiff's impairments.

The Magistrate finds that a job is in the light category if it requires a good deal of walking and/or standing but it may involve sitting most of the time with some pushing and pulling of arm or leg controls. 20 C. F. R. § 220.132(b) (Thomson Reuters 2010). The amount of time spent standing and/or walking is not designated. The contention that Plaintiff cannot perform light work since he cannot walk and/or stand for six hours does not contravene the ALJ's finding that Plaintiff can perform light work.

5.  **WAS THE HYPOTHETICAL QUESTION POSED TO THE VE INCOMPLETE AND INACCURATE WITH RESPECT TO PLAINTIFF'S ABILITY TO WALK?**

Plaintiff claims that the ALJ failed to include in the hypothetical posed to the VE his inability to walk. Defendant concedes that walking is absent from the hypothetical. However, standing and walking are often grouped together when discussing a person's limitations. Thus the ALJ and VE considered Plaintiff's inability to either walk or stand despite its absence from the hypothetical.

Although the ALJ failed to mention walking in the hypothetical questions posed to the VE, the VE testified that Plaintiff could perform his past relevant work which included limited walking requirements

(Tr. 369). The Magistrate does not find the failure to include walking in the hypothetical question harmful error since the VE considered the walking responsibility in his response to the hypothetical question.

**6.      DID THE ALJ FAIL TO IDENTIFY THE PRECISE PAST RELEVANT WORK?**

Plaintiff suggests that the ALJ and VE misidentified his past relevant work as a restaurant manager as skilled, light work. His past relevant work was generally more demanding than the specific job as actually performed. As actually performed, the work was probably considered medium work. Plaintiff cannot perform his past relevant work as generally performed or as actually performed. Defendant argues that the restaurant manager, as generally performed, is light work. If Plaintiff could perform medium work, he could perform light work. The ALJ correctly found that Plaintiff could perform his past relevant work.

In the Sixth Circuit, the ALJ need only find that a claimant can perform his or her past relevant work as it is generally performed in the national economy. *Studaway v. Secretary of Health & Human Services,* 815 F.2d 1074, 1076 (1987). Therefore the claimant must show that he or she was unable to return to his or her previous work and not simply his or her previous specific job. *Carter v. Secretary of Health and Human Services*, 834 F. 2d 97, 98 (6th Cir. 1987) (*citing De Loatche v. Hecker*, 715 F. 2d 148, 151 (4th Cir. 1983)). The claimant may negate this finding by showing that his or her impairments are so severe that he or she is unable to do his or her previous work. *Studaway, supra,* 815 F. 2d at 1076.

The Magistrate is persuaded that Plaintiff's past relevant job, as he performed it, was probably considered medium work. The uncontroverted evidence shows that Plaintiff, with his impairments, is incapable of returning to his past specific job as he performed it. However, Plaintiff has not demonstrated an inability to return to his former *type* of work as a food manager. The food manager-type job, defined by the DOT, is primarily an administrative activity. The ALJ's determination that Plaintiff is capable of

16

performing restaurant administrative-*type* work as it was generally performed in the national economy is supported by substantial evidence.

**7.     DID THE ALJ ERRONEOUSLY RELY ON THE GRIDS FOR UNSKILLED WORK?**

Plaintiff claims that the ALJ relied on the Grids despite a finding that he had non-exertional limitations, non-transferrable skills.  Plaintiff argues that when referring to the Grids, the ALJ applied the wrong sections that relate to unskilled work.  Defendant concedes that the ALJ relied on the wrong sections of the Grids considering that the VE testified that Plaintiff had transferrable skills from his previous employment.   However, reliance on the Grids was harmless error since the ALJ obtained the testimony of a VE.

ALJs use the grids during the fifth and final step of disability determinations.  *Bollenbacher v. Commissioner of Social Security*, 621 F.Supp.2d 497, 503 (N. D. Ohio 2008) (*citing Abbott v. Sullivan,* 905 F.2d 918, 923 (6ᵗʰCir. 1990)).  "After the ALJ determines that the plaintiff is incapable of performing past relevant work, he or she uses [the grids] to determine whether plaintiff can perform other jobs in the national economy."  *Id.* (*citing Heston v. Commissioner of Social Security,* 245 F.3d 528, 536 (6ᵗʰ Cir. 2001)).  If any individual suffers from both exertional and non-exertional impairments, the grids may only be used as a framework.  *Id.* (*citing Abbott, supra,* 905 F.2d at 926-927).  The ALJ must rely on other evidence to show that plaintiff can perform a significant number of jobs that exist in the national economy.  *Id.* at 503-504 (*citing* 20 C.F.R. § 404.1567; *Burton v. Secretary of Health & Human Services,* 893 F.2d 821, 822 (6ᵗʰ Cir. 1990)).

The Magistrate finds that the ALJ relied on the wrong sections of the Grids; however, the findings in the decision that are based on principles in the Grids are superfluous.  The ALJ obtained guidance from the VE about whether Plaintiff can perform past relevant work and whether other jobs exist in significant numbers. With the assistance of the VE, the ALJ was able to sustain the proof necessary to show

17

compliance with steps four and five of the sequential evaluation.  The application of the Grids under these circumstances was harmless error since the ALJ supplied alternate proof that Plaintiff can perform his past relevant work.

## CONCLUSION

For the foregoing reasons, the Magistrate recommends that the Commissioner's decision be affirmed and that the referral to the Magistrate be terminated.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Dated: August 6, 2010

## NOTICE

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed.  Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, as amended on December 1, 2009, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof.  Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure. The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections.  Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

Please note that the Sixth Circuit Court of Appeals determined in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) that failure to file a timely objection to a Magistrate's report and recommendation

foreclosed appeal to the court of appeals.  In *Thomas v. Arn*, 106 S. Ct. 466 (1985), the Supreme Court upheld that authority of the court of appeals to condition the right of appeal on the filing of timely objections to a report and recommendation.